UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:09-CR-00152-FL

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM &** |
| | ) | **RECOMMENDATION** |
| MANUEL CUBIAS-RIVAS, | ) | |
| a/k/a Philip Carrillo-Rivas, | ) | |
| | ) | |
| DEFENDANT. | ) | |

This matter is before the Court on the motion of Defendant, Manuel Cubias-Rivas, also known as Philip Carrillo-Rivas, ("Cubias-Rivas" or "Defendant") to suppress evidence seized and statements made as a result of Defendant's arrest and the search of Defendant's residence. [DE-23.] The Government filed a response in opposition to the motion. [DE-27.] To further develop the record, the Court conducted an evidentiary hearing on September 18, 2009, at which the Government and Defendant with counsel appeared. This matter is now ripe for decision.

## I.    STATEMENT OF THE FACTS

Derrick Faulcon, a detective with the Raleigh Police Department ("RPD"), was the sole witness at the suppression hearing. He testified as to the investigation and arrest of Cubias-Rivas and the subsequent search of Cubias-Rivas's residence. Detective Faulcon had, at the time of the arrest, approximately 12 years of experience with the RPD, 9 ½ years as a patrol officer and 2 ½ years as a detective in the drugs and vice investigative division. During this time, he received training on how to handle

informants, interview techniques, and the identification and sale of illicit drugs, and he conducted numerous investigations as lead agent using confidential informants.

Detective Faulcon testified that on March 25, 2009, he was contacted by a confidential informant ("CI") with information that a Hispanic male known as "Guero" or "white boy" was selling cocaine from a location off Bashford Road. The CI also provided the suspect's cell phone number and a description of his vehicle.

Detective Faulcon had previously worked with this CI on approximately twelve other cases, and the CI had also worked with other detectives. The CI began working for the RPD after he was charged with cocaine trafficking at the end of 2007 or the beginning of 2008. In exchange for a reduction in his sentence, the CI agreed to cooperate with the RPD by providing information on other drug dealers and making controlled buys. He "worked off" his charges and was placed on probation, but continued working as a paid informant, i.e., if the CI provided credible information used by the RPD to make a drug transaction, then at the end of the transaction the CI was paid between $40 and $150. Over the course of the year prior to the Cubias-Rivas arrest, the CI provided the RPD with information that led to arrests in several cases. Detective Faulcon believed this CI to be one of the better informants that he worked with because the CI provided highly accurate information. The CI has since been deported from the United States.

Subsequent to Detective Faulcon's telephone conversation with the CI, the two met at the police station and again went over the details regarding the suspect reported to be dealing drugs. The CI agreed to attempt a controlled drug buy, and Detective Faulcon questioned the CI regarding how a normal drug deal with the suspect would work. The CI indicated that he could get one gram for approximately $50 and possibly

2

three to four ounces over multiple buys. Detective Faulcon gave the CI $50 in recorded currency with which to buy one gram of cocaine and searched the CI and his vehicle for drugs or contraband. He described search as routine, during which he checked the CI's pockets, wallet, and hat (if he was wearing one), and searching the console, glove box, and trunk area of the CI's vehicle. No drugs or contraband were found during the search. He did not search the CI's shoes or under the hood of his car. Detective Faulcon next followed the CI to a K-Mart parking lot, which was approximately 12 minutes from the police station. Once in the parking lot, the CI entered Detective Faulcon's vehicle and directed him to the suspect's residence.

The CI directed Detective Faulcon to an apartment complex known as Inona Place and identified a green Isuzu Rodeo as the suspect's vehicle. The CI then pointed to the second apartment from the left and identified it as the suspect's residence. Detective Faulcon parked and using binoculars obtained the license plate from the identified vehicle. Detective Faulcon then left Inona Place, and the CI directed him to a nearby parking lot off Saddle Seat Drive where the CI indicated the drug transaction would take place. Detective Faulcon and the CI then returned to K-Mart where they planned the drug buy from the suspect: they would drive separately to Saddle Seat Drive, the CI would go to the designated meeting place, wait for Detective Faulcon to arrive at Inona Place, the CI would call the suspect and set up a buy, Detective Faulcon would follow the suspect, and after the buy the CI and Detective Faulcon would meet back at K-Mart.

The CI left K-Mart, followed by Detective Faulcon, and they returned to Saddle Seat Drive. Detective Faulcon then proceeded alone to Inona Place to surveil the suspect's residence. The CI waited a short time to allow Detective Faulcon to get to Inona Place

3

and then phoned the suspect to arrange the drug buy. The CI was not under surveillance of any kind during this time. Approximately two minutes after the CI called the suspect, Detective Faulcon saw a Hispanic male, whom he identified in court as the Defendant, Cubias-Rivas, leave the third apartment from the left in the building identified by the CI. Cubias-Rivas got into the green Isuzu Rodeo, which the CI previously identified as the suspect's vehicle, and left Inona Place.

Detective Faulcon followed Cubias-Rivas to Saddle Seat Drive, where Cubias-Rivas met the CI. The distance from Inona Place to the meeting area was approximately a quarter mile and took less than a minute to drive. Detective Faulcon followed at a distance of 40-50 yards and lost visual contact with Cubias-Rivas, but when he turned onto Saddle Seat Drive he clearly saw Cubias-Rivas at the driver's side door of the CI's vehicle, where the CI was in the driver's seat. Detective Faulcon continued to the next corner where he visually monitored the vehicles, but could not see the transaction occur. The CI did not wear a wire or any other type of surveillance device. Detective Faulcon watched the CI and Cubias-Rivas for approximately two to three minutes, and during that time he saw no other vehicles or people approach. Cubias-Rivas left the meeting, followed by Detective Faulcon, and returned to Inona Place, parked his vehicle, and re-entered the same apartment he left from earlier.

Detective Faulcon returned to the K-Mart parking lot approximately ten minutes later to meet the CI. There was no surveillance of the CI from the time Detective Faulcon left Saddle Street Drive, following Cubias-Rivas, until the CI returned to the K-Mart. Detective Faulcon debriefed the CI, recorded the drugs, and searched the CI and his vehicle for additional drugs or contraband. The CI gave Detective Faulcon

4

approximately 0.5 grams of powder cocaine packaged in a small, yellow ziplock bag. Detective Faulcon explained that it was not unusual for a dealer to short the buyer in a drug transaction. The CI reported that he and Cubias-Rivas discussed future drug buys and that he could make another deal with Cubias-Rivas the next day. Detective Faulcon paid the CI and the two parted ways.

The following day, March 26, 2009, the CI again called Detective Faulcon regarding Cubias-Rivas. The CI stated that he would not be able to get the three to four ounces of cocaine he presumed earlier, but that Cubias-Rivas would sell him seven grams of powder cocaine and give him seven ounces of powder cocaine to cook into crack cocaine and return. Detective Faulcon explained that it is not unusual for a dealer who does not know how to cook crack cocaine to find someone else to cook the crack. The CI and Detective Faulcon agreed to proceed with a second transaction to occur at the same location and in the same manner as the earlier transaction.

Detective Faulcon then proceeded to obtain a search warrant for Cubias-Rivas's residence at Inona Place based on the drug deal from the previous day. Detective Faulcon believed that Cubias-Rivas had drugs stored in the residence because Cubias-Rivas did not make any stops on the way to the transaction and did not appear to be weighing or packaging drugs in his vehicle.

Later in the evening, Detective Faulcon met the CI and again searched him and his vehicle, but did not give the CI any money because Detective Faulcon planned to arrest Cubias-Rivas before any exchange could occur. The CI returned to the Saddle Seat Drive area and Detective Faulcon and another officer went to Inona Place. Once in position, Detective Faulcon called the CI and instructed him to call Cubias-Rivas.

Detective Faulcon saw Cubias-Rivas outside in the Inona Place parking lot with two other Hispanic males. The hood of his vehicle was raised as if they were working on the vehicle. Within a minute of Detective Faulcon's call to the CI, Cubias-Rivas answered his cell phone, went into the same apartment as before, re-emerged, lowered the hood of his vehicle, got in and drove off. Detective Faulcon followed Cubias-Rivas and alerted other officers stationed in covert positions near the buy location, as the other officers had been instructed to arrest Cubias-Rivas as soon as he arrived at the buy location.

Cubias-Rivas pulled up next to the CI's vehicle and an officer immediately approached Cubias-Rivas's vehicle, removed him, and conducted a pat down search, which Detective Faulcon observed. A loaded, semi-automatic pistol was recovered from Cubias-Rivas's waistband. Cubias-Rivas was placed in handcuffs and further searched. The officer recovered multiple bags of cocaine from his pockets, approximately seven grams from one pocket, eight grams from the other pocket, and two smaller bags packaged for distribution. The officers searched Cubias-Rivas's vehicle and then took him to the RPD.

Detective Faulcon returned to RPD and briefed the SWAT team regarding in preparation to execute the search warrant on Cubias-Rivas's residence. Detective Faulcon, along with Cubias-Rivas, and the SWAT team proceeded to Inona Place. A woman answered the door at Cubias-Rivas's residence and the officers entered and searched the premises while Cubias-Rivas remained in the police car. The officers found scales, baggies, an unknown white substance thought to be used as a cutting

agent, and razor blades. After concluding the search of Cubias-Rivas's residence, Detective Faulcon returned to the RPD with Cubias-Rivas.

Detective Faulcon placed Cubias-Rivas in an interview room with Officer Cooper. Cubias-Rivas was given a copy of his Miranda Rights in Spanish to read, while Detective Faulcon read the Miranda rights to him in English. Cubias-Rivas requested a lawyer and the interview stopped. Detective Faulcon then took Cubias-Rivas back to his office in the drugs and vice department to process his paperwork. While Cubias-Rivas was seated in front of Detective Faulcon's desk, he spontaneously stated that he had previously been deported and that he could obtain one kilogram of cocaine. Detective Faulcon advised Cubias-Rivas to discuss those things with his attorney.

On May 21, 2009, a federal grand jury indicted Cubias-Rivas for possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1), possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1), possession of a firearm by a felon in violation of 18 U.S.C. §§ 922(g)(1) and 924, possession of a firearm by an illegal alien in violation of 18 U.S.C. §§ 922(g)(5) and 924, and illegal re-entry into the United States in violation of 8 U.S.C. § 1326(a) & (b)(2). The indictment further alleged that Cubias-Rivas was previously deported after being convicted of an aggravated felony and also included a forfeiture notice.

## II.    DISCUSSION

Cubias-Rivas argues that all evidence seized and statements made following his arrest should be suppressed because law enforcement did not have probable cause to make a warrantless arrest and that all evidence seized during the search of Cubias-

Rivas's residence should be suppressed because the search warrant was not supported by probable cause.

## A. Probable Cause for Warrantless Arrest

Defendant asserts that he was arrested based on the uncorroborated statements of a paid informant and that the "controlled buy" used in the investigation of Defendant was, in fact, not controlled. Defendant asks the Court to find that probable cause was lacking for a warrantless arrest. The Government asserts that law enforcement had probable cause to arrest Defendant based on the totality of the circumstances.

The Fourth Circuit has recently restated the law with respect to warrantless arrests:

> A warrantless arrest is constitutionally permissible if there is probable cause for the arresting officer to believe that a felony is being or has been committed by the arrested individual. See United States v. McCraw, 920 F.2d 224, 227 (4th Cir.1990). Probable cause to arrest exists if the facts and circumstances within the arresting officers' knowledge at the moment the arrest is made would be sufficient for a prudent man to believe that the defendants had committed an offense. United States v. Dorlouis, 107 F.3d 248, 255 (4th Cir.1997). "While probable cause requires more than bare suspicion, it requires less than that evidence necessary to convict." United States v. Gray, 137 F.3d 765, 769 (4th Cir.1998) (internal quotation marks omitted). Even "seemingly innocent activity" can provide the basis for probable cause when considered in the context of the surrounding circumstances. Taylor v. Waters, 81 F.3d 429, 434 (4th Cir.1996).

United States v. Joy, 2009 WL 1918977, at *2 (4th Cir. July 2, 2009) (unpublished op.).

In the present case, the arrest was based in large part on information provided by the CI, including a "controlled buy" conducted by the CI under the direction of Detective Faulcon. The CI in this case had been used previously by Detective Faulcon, as well as other officers, and Detective Faulcon testified that the CI was one of the better informants and that he had never provided false information. The CI told Detective Faulcon that Defendant was selling drugs, where he lived, what vehicle he drove, and

where he conducted his drug transactions. Detective Faulcon then set up a controlled buy to confirm the information provided by the CI. Detective Faulcon, who was an experienced officer, determined from the information provided by the CI and the actions of Defendant that he was selling drugs. After the CI purchased cocaine from Defendant, Detective Faulcon set up a second buy where Defendant was arrested and found to be in possession of cocaine. The Court finds that based on the totality of the circumstances, sufficient probable cause existed to support Defendant's arrest. See United States v. Woods, 201 F.3d 439, at *1-*2 (4th Circuit Nov. 29, 2009) (Table) (upholding district court's finding of probable cause for arrest where a historically reliable informant told officers that defendant sold him crack at specific locations, that defendant used many vehicles, including a maroon van, and where the informant arranged a buy and minutes later a maroon van left the suspect's residence).

The fact that the CI did not wear surveillance equipment such as a video or audio recording device during the controlled buy does not, as Defendant asserts, make the controlled buy meaningless. The Fourth Circuit in United States v. Casanova rejected the argument that probable cause was lacking where the confidential informant did not wear a body wire and was not under visual surveillance during the entire buy. See United States v. Casanova, 168 F.3d 483, at *2 (4th Cir. Jan. 5, 1999) (Table) ("Ordinarily, an informant's controlled buy may constitute probable cause sufficient for a magistrate judge to issue a warrant.") (citing United States v. Clyburn, 24 F.3d 613, 618 (4th Cir. 1994)). The court specifically declined to apply in a formulaic manner the general procedure for a controlled buy described in Clyburn, 24 F.3d at 615 n.1. See Casanova, 168 F.3d 483, at *2. The Casanova court instead adopted a "common

sense approach" to evaluate whether an informant's controlled buy may constitute probable cause. See Casanova, 168 F.3d 483, at *2. The Casanova court found that the controlled buy sufficiently corroborated the information provided by the informant even though the informant did not wear a wire and was not under constant surveillance during the buy. Similarly, in this case, Detective Faulcon met with the CI, searched him and his vehicle, provided him with recorded cash, visually monitored the buy meeting between the CI and Defendant, and a short time later obtained the drugs from the CI. The Court finds that, under the circumstances, the controlled buy was sufficient to corroborate the information the CI gave to Detective Faulcon and that the law enforcement officers were justified in relying on the controlled buy to establish probable cause to arrest Defendant.

Defendant also asserts that because many of the facts provided by the CI and corroborated by Detective Faulcon were seemingly innocent (e.g., the vehicle Defendant drove, where Defendant lived,[1] and the location where the buy would occur), they do not support a finding of probable cause. The case law does not support this position. See United States v. Lalor, 996 F.2d 1578, 1581 (4th Cir. 1993) (finding that "conformation of [defendant's] address, vehicle and alias gives credence to the allegations of criminal activity") (citing Alabama v. White, 496 U.S. 325, 332 (1990)). Based on the Detective Faulcon's previous experiences with this particular CI, where he was found to be reliable, and that the information provided by the CI was corroborated

---

[1] The fact that the CI pointed to the second door from the left, but Detective Faulcon later determined Defendant's residence was the third door from the left, is not material and does not render the CI unreliable. Considering that the CI was only one door off, was accurate in the other information provided, and had historically provided credible information, Detective Faulcon was justified in relying on the CI.

with a controlled buy, the officers were reasonable in relying on the information provided by the CI to establish probable cause to arrest Defendant.

## B. Probable Cause for Search Warrant

Defendant asserts that the search warrant for his residence was not supported by probable cause because there was no nexus between his residence and the alleged criminal activity. Defendant further argues that the warrant was so facially deficient that the officers were unreasonable in their reliance on the warrant. The Government responds that sufficient probable cause existed to issue the search warrant and, alternatively, that the good faith exception to the exclusionary rule would apply to sustain seizure of the evidence found incident to the search.

### 1. Nexus

The Court must look to the affidavit submitted in support of the search warrant to determine whether there was probable cause to issue the warrant.

> In determining whether a search warrant is supported by probable cause, the crucial element is not whether the target of the search is suspected of a crime, but whether it is reasonable to believe that the items to be seized will be found in the place to be searched. _Zurcher v. Stanford Daily,_ 436 U.S. 547, 556 & n. 6, 98 S.Ct. 1970, 1976-77 & n. 6, 56 L.Ed.2d 525 (1978). In _Anderson,_ 851 F.2d 727, this court adopted the rule that "the nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence." _Id._ at 729. The court held that probable cause can be inferred from the circumstances, and a warrant is not invalid for failure to produce direct evidence that the items to be seized will be found at a particular location. _See id._ (reasonable to infer that pistol and silencer would be found at defendant's residence).

Lalor, 996 F.2d at 1582. The Probable Cause Affidavit, made by Detective Faulcon, stated the following relevant facts: a controlled delivery for the purchase of cocaine was made utilizing a confidential informant that had provided accurate and truthful

information to Detective Faulcon in the past; the CI stated that the suspect lived off Inona Place and described the suspect as a Hispanic male; Detective Faulcon observed a Hispanic male come from 6048 Inona Place and meet the CI in the 5700 block of Saddle Seat Drive to sell the CI cocaine; and after the controlled delivery took place, Detective Faulcon observed the suspect return to 6048 Inona Place. See Def.'s Memo. in Supp., Ex. B.

The Court finds that the facts stated in Detective Faulcon's affidavit are sufficient to establish a nexus between the drugs and 6048 Inona Drive and to establish probable cause for the search warrant. Defendant concludes that upholding the sufficiency of this affidavit would mean that "a search warrant could be obtained for *any* location where a drug dealer hangs out between deals." Def.'s Memo. in Supp. at 13. Such a generalization is unfounded. Where the place to be searched was Defendant's *residence*, it is reasonable to conclude that Defendant would store property of value or property he desired to keep private, such as drugs. When coupled with the fact that Defendant was seen coming to and from the residence to meet the CI in order to sell him cocaine, it is not unreasonable to conclude that drugs would be found at that location. See United States v. Grossman, 400F.3d 212, 217 (4th Cir. 2005) ("[O]ur cases indicate that a sufficient nexus can exist between a defendant's criminal conduct and his residence even when the affidavit supporting the warrant 'contains no factual assertions directly linking the items sought to the defendant's residence.' *United States v. Servance*, 394 F.3d 222, 230 (4th Cir.2005).")

**2. The CI and Controlled Buy**

Detective Faulcon's affidavit was based in large part on information obtained from the CI and the controlled buy.

> In order to establish probable cause for the issuance of a search warrant based in part on an informant's tip, it is necessary to consider all the circumstances set forth in the affidavit. *See Hodge*, 354 F.3d at 309 (citing *Gates*, 462 U.S. at 238, 103 S.Ct. at 2317). Moreover, "[a]lthough the informant's veracity, reliability and basis of knowledge are relevant, they are no longer independent requirements." *United States v. Lalor*, 996 F.2d 1578, 1581 (4th Cir.1993) (citing *Gates*, 462 U.S. at 230, 103 S.Ct. at 2328). "An important factor in determining whether an informant's report establishes probable cause is the degree to which it is corroborated." *Lalor*, 996 F.2d at 1581. In addition, "[c]orroboration of apparently innocent details of an informant's report tends to indicate that other aspects of the report are also correct." *Id.*

United States v. Parks, 2009 WL 541389, at *2 (M.D.N.C. March 4, 2009) (unpublished op.). As addressed in Part II, A, supra, the Court rejects Defendant's arguments that the information from the CI and the controlled buy were not sufficient to support probable cause.

### 3. Good Faith Exception

Even if the warrant were not supported by probable cause, the Court finds that in this case the good faith exception to the exclusionary rule would apply and validate the search. The Fourth Circuit recently summarized the law with respect to the good faith exception:

> Generally, evidence seized in violation of the Fourth Amendment is subject to suppression under the exclusionary rule, *see United States v. Calandra,* 414 U.S. 338, 347-48, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *Perez,* 393 F.3d at 460, the overarching purpose of which is "to deter future unlawful police conduct," *Calandra,* 414 U.S. at 347, 94 S.Ct. 613. The deterrence objective, however, "is not achieved through the suppression of evidence obtained by 'an officer acting with objective good faith' within the scope of a search warrant issued by a magistrate." *Perez,* 393 F.3d at 461 (quoting *Leon,* 468 U.S. at 920, 104 S.Ct. 3405); *see United States v. Mowatt,* 513 F.3d 395, 404 (4th Cir.2008) ("[I]t is the magistrate's responsibility to determine whether probable cause exists,

13

and officers cannot be expected to second-guess that determination in close cases."). Thus, in *Leon,* the Supreme Court modified the exclusionary rule to allow the use of evidence "obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause." *Leon,* 468 U.S. at 900, 104 S.Ct. 3405. " *Leon* teaches that a court should not suppress the fruits of a search conducted under the authority of a warrant, even a 'subsequently invalidated' warrant, unless 'a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.' " *United States v. Bynum,* 293 F.3d 192, 195 (4th Cir.2002) (quoting *Leon,* 468 U.S. at 922 n. 23, 104 S.Ct. 3405). Accordingly, "under *Leon*'s good faith exception, evidence obtained pursuant to a search warrant issued by a neutral magistrate does not need to be excluded if the officer's reliance on the warrant was 'objectively reasonable.' " *Perez,* 393 F.3d at 461 (quoting *Leon,* 468 U.S. at 922, 104 S.Ct. 3405).

United States v. Andrews, 577 F.3d 231, 235-236 (4th Cir. 2009) (internal citations omitted). The court went on the recognize the four well known circumstances where reliance on a search warrant would not be "objectively reasonable": (1) where the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing magistrate wholly abandoned his judicial role as a detached and neutral decisionmaker; (3) where the officer's affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where a warrant [is] so facially deficient ... that the executing officers cannot reasonably presume it to be valid. Id. at 236. Defendant argues that because the first and third circumstances apply to the facts of this case, the good faith exception is unavailable to save the evidence seized from exclusion.

### a. Magistrate Issuing the Warrant was Not Misled

Defendant contends that the affidavit was misleading in that it stated that a controlled delivery was made, when in fact the delivery was not controlled. The Court

has already considered and rejected Defendant's assertion that the controlled buy was deficient because the CI did not wear a wire and was not under constant visual surveillance. Defendant further contends that the affidavit is written in such a way to obscure the fact that Detective Faulcon was the only officer involved in the investigation and controlled buy. Under United States v. Colkley, 899 F.2d 297, 300-01 (4th Cir. 1990), the defendant must show that (1) the officer deliberately or recklessly omitted the information at issue, and (2) the inclusion of the information would have defeated probable cause. The Court finds Defendant's reading of the affidavit strained and sees no indication from the text of the affidavit that Detective Faulcon attempted to give the false impression that other officers were involved in the controlled buy. Additionally, the Court finds that the fact that he was the only officer involved would not defeat probable cause. The Court has already determined that the controlled buy, as carried out, was not deficient. The Court concludes that Defendant has failed to show that the magistrate was mislead by Detective Faulcon's affidavit.

### b. Affidavit is Not Lacking in Indicia of Probable Cause

Defendant contends that a reasonable officer would not rely on the search warrant because it fails to establish the reliability of the informant and it fails to establish a nexus between the criminal activity and the location to be searched. Each of these arguments was considered and rejected by the Court supra. Cf. Lalor, 996 F.2d at 1583 (finding good faith exception applied even though warrant application failed to establish a nexus between the drug activity and the location searched).

The Court finds that Defendant has shown no circumstances present in this case that would prevent application of the good faith exception to the exclusionary rule and

that there is no reason to conclude that a reasonable officer would have thought the search to be illegal despite the issuance of the warrant.

## III. CONCLUSION

Having found no support for Defendant's claims in the record, the Court **RECOMMENDS** that the Motion to Suppress [DE-23] be **DENIED**.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have ten (10) days from the date of receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

This the 23rd day of October, 2009.

DAVID W. DANIEL
United States Magistrate Judge