IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:09-CR-152-FL

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MANUEL CUBIAS-RIVAS, | ) | **ORDER** |
| a/k/a PHILLIP CARRILLO-RIVAS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter comes before the court on defendant's motion to suppress (DE # 23). Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Criminal Procedure 59(b), United States Magistrate Judge David W. Daniel entered a memorandum and recommendation ("M&R") wherein he recommended the court deny defendant's motion (DE # 34). Defendant timely filed objection to the M&R (DE # 35), and the government responded (DE # 36). In this posture, the issues raised are ripe for ruling. For the reasons that follow, the court denies defendant's motion to suppress.

**STATEMENT OF THE CASE**

Defendant was arrested during a controlled sale of drugs to a confidential informant ("CI") on March 26, 2009. Officers searched defendant's residence following his arrest, although that search was executed pursuant to a search warrant obtained prior to the arrest. He seeks to suppress statements made following his arrest as well as physical evidence, including a firearm and drugs seized from his person during the arrest as well as various items taken from his residence pursuant to the subsequent search. Defendant challenges both the warrant and the arrest on the grounds that neither were supported by probable cause.

In his motion, filed August 24, 2009, defendant first argues that law enforcement did not have probable cause to arrest him without a warrant. Defendant contends that he was arrested based on uncorroborated statements of the CI, who was being compensated for his efforts. More specifically, defendant contends that law enforcement did not follow established procedure for controlled purchases (or "controlled sales" or "controlled buys"). Defendant next contends that probable cause did not exist to support the issuance of a warrant for his residence because there was no nexus between the residence and the alleged criminal activity. Furthermore, he contended that the warrant was so facially deficient that law enforcement officers could not have relied upon it in good faith.

The government filed response to defendant's motion to suppress on September 8, 2009. On September 18, 2009, a hearing on the motion was held before the magistrate judge. On October 23, 2009, the magistrate judge recommended in his M&R that the motion be denied. With regards to defendant's arrest, he found that the police had probable cause to effect a warrantless arrest based on the past reliability of the CI, law enforcement's corroboration of certain details given by the CI, and law enforcement's observation of the circumstances surrounding the first controlled purchase. The magistrate judge also noted that law enforcement need not mechanically follow every detail of the controlled purchase procedures approved by the Fourth Circuit to establish probable cause. With regards to the search, the magistrate judge found that the facts stated in the affidavit in support of the warrant, also based largely on the first controlled purchase with the CI, were sufficient to establish a nexus between the alleged criminal activity and defendant's residence. He went on to note that, even if the warrant had not been supported by probable cause, the good faith exception would have applied.

On November 9, 2009, defendant filed the following two objections to the findings and recommendations of the magistrate judge: (1) the magistrate judge erred in finding that the CI's alleged purchase of cocaine constituted a controlled purchase as commonly understood and approved by the Fourth Circuit, and that therefore there was no probable cause to support the arrest or warrant; (2) the magistrate judge erred in finding a nexus between the drugs or drug transaction and his residence. This court reviews those portions of the M&R to which defendant has objected *de novo*. See 28 U.S.C. § 636(b)(1).

## STATEMENT OF THE FACTS[1]

Derrick Faulcon, a detective with 12 years of experience with the Raleigh Police Department ("RPD"), including more than two years experience as a detective, was contacted by a CI with information that a Hispanic male was selling cocaine from a location off Bashford Road. The CI, who had proven reliable in approximately twelve previous cases with Detective Faulcon as well as other cases with other detectives, was able to provide the suspect's cell phone number and a description of his vehicle. Detective Faulcon met with the CI and the two agreed to stage a controlled purchase in which the CI would attempt to obtain one gram of cocaine from the suspect for a price of $50. As with other controlled purchases, if the CI provided credible information used by the RPD, then at the end of the transaction he would be paid between $40 and $150.

Detective Faulcon gave the CI $50 in recorded currency and searched the CI's person and vehicle for drugs or contraband. Finding no drugs or contraband, Detective Faulcon followed the CI to a K-Mart parking lot, at which point the CI got into the detective's car and directed him to an

---

[1] Defendant informs the court that "he does not materially object to the Magistrate Judge's findings of fact." (Def. Obj. 2.) Therefore the court, for its own analysis, incorporates by reference the "Statement of the Facts" as set out in the M&R. (See M&R 1-7.) However, the court finds it helpful to summarize the most relevant facts.

3

apartment complex known as Inona Place, identifying one of the apartments as defendant's residence. The CI also pointed to a green Isuzu Rodeo, identifying it as the suspect's vehicle. Detective Faulcon was able to obtain the license plate number of the Rodeo. Detective Faulcon and the CI left the apartment complex and drove to a nearby parking lot off Saddle Seat Drive where the CI indicated the controlled purchase would take place.

Detective Faulcon and the CI returned to the K-Mart parking lot to finish planning the controlled purchase: They would drive separately to Saddle Seat Drive and the CI would go to the designated meeting place. Detective Faulcon would then head to Inona Place. After waiting a sufficient time for the detective to arrive, the CI – who would not be under any surveillance at this time – would call the suspect and set up the purchase, Detective Faulcon would follow the suspect, and after the purchase the CI and Detective Faulcon would meet back at the K-Mart parking lot.

The controlled purchase proceeded according to this plan. Approximately two minutes after the CI called the suspect, Detective Faulcon saw a Hispanic male, whom he identified in court as defendant, leave an apartment adjacent to that pointed out by the CI and get into the green Isuzu Rodeo. Detective Faulcon followed defendant to the meeting area on Saddle Seat Drive, losing visual contact for a short time. When he turned onto Saddle Seat Drive, Detective Faulcon saw defendant at the driver's-side door of the CI's car, with the CI in the driver's seat. He visually monitored the vehicles but did not see the transaction occur. The CI was not wearing a wire or any other surveillance device.

Subsequent to the meeting between defendant and the CI, Detective Faulcon followed defendant directly back to his apartment at Inona Place. Approximately ten minutes later, Detective Faulcon returned to the K-Mart parking lot to meet with the CI. (There was no surveillance of the

4

CI between his meeting with defendant on Saddle Street Drive and this meeting at the K-Mart parking lot with Detective Faulcon.) The CI gave the detective approximately 0.5 grams of powder cocaine in a small, yellow ziplock bag. Detective Faulcon debriefed the CI, recorded the drugs, and searched the CI for additional drugs or contraband. The CI reported that he had discussed future drugs buys with defendant and could set up another deal the next day. Detective Faulcon paid the CI and the two parted ways.

The CI contacted Detective Faulcon the next day. After confirming that they would proceed with the second proposed transaction, Detective Faulcon obtained the search warrant in question based on the first controlled purchase. Detective Faulcon believed that defendant had drugs stored at his residence at Inona Place because he did not make any stops on his way to the transaction and did not appear to be weighing or packing drugs in the vehicle.

Detective Faulcon, assisted by additional law enforcement, then began the second transaction. The same protocols and meeting place were used, although the CI was not provided with marked currency because Detective Faulcon planned to arrest defendant before the transaction could occur. After the CI placed the call to defendant, Detective Faulcon observed the latter enter his residence, re-emerge, get into his vehicle, and drive off. Detective Faulcon followed defendant and alerted other officers stationed near the buy location. When defendant pulled up next to the CI's vehicle, officers immediately moved in to arrest him.

During a search incident to the arrest, officers recovered a handgun and multiple bags of cocaine. They then drove defendant to the police station where Detective Faulcon briefed the SWAT team regarding the search of his residence pursuant to the warrant. The officers then went to defendant's residence, searched it, and discovered scales, baggies, an unknown white substance, and

5

razor blades. Following the search of his residence, defendant was placed in an interview room and read his rights, with a copy of them given to him in Spanish to read. Defendant invoked his right to counsel and the interview stopped. While defendant was seated in front of Detective Faulcon's desk for further processing, he spontaneously made incriminating statements. Detective Faulcon advised defendant to discuss the statements with his attorney.

**DISCUSSION**

A.   The Controlled Purchase of Drugs

Defendant first contends that Detective Faulcon's investigation did not comport with the requirements of a controlled purchase as defined by the Fourth Circuit in United States v. Clyburn, 24 F.3d 613 (4th Cir. 1994), and that there was consequently no probable cause to effect his arrest without a warrant or to obtain a search warrant for his residence.[2] Defendant contends that, while officers need not follow all of the procedures set forth in Clyburn, the "cursory procedures" put in place by Detective Faulcon were insufficient to achieve the "control" needed for a controlled purchase. Defendant argues that there must be some sufficient combination of control procedures to ensure the reliability of the evidence gained. For the reasons that follow, the court disagrees.

The court first notes that Clyburn court was more concerned with whether an officer's unrecorded oral testimony may support a magistrate judge's probable cause determination than with codifying specific procedures for controlled buys, which it addresses in a footnote simply as a reference to the district court's description of those procedures. Even with his concession that law enforcement need not follow the Clyburn procedures to a tee, defendant's argument comes close to

---

[2] Defendant's objection to the controlled buy as it relates to the search of his residence is addressed in Part B of the court's discussion because it is intertwined with his argument that no sufficient nexus existed between the alleged drug activity and his residence.

"invit[ing] the court to employ a hypertechnical analysis by assigning a lengthy and specific definition to the concept of a 'controlled buy.'" United States v. Casanova, 468 F.3d 284, 1999 WL 2522, at *2 (4th Cir. 1999) (unpublished table decision). Instead of this hypertechnical analysis, the court must look to the totality of the circumstances to determine whether probable cause supported the arrest. Maryland v. Pringle, 540 U.S. 366, 371 (2003). In the context of arrest, probable cause exists when "facts and circumstances [are] sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." Rogers v. Pendleton, 249 F.3d 279, 290 (4th Cir. 2001) (quoting Gerstein v. Pugh, 420 U.S. 103, 111 (1975)) (second alteration in original).

In the totality of the circumstances analysis, one of the factors the court "considers [is] the informant's reliability and the basis of the informant's knowledge." Clyburn, 24 F.3d at 617 (citing Illinois v. Gates, 462 U.S. 213, 233 (1983)). As "one whom [Detective Faulcon] knew and who had provided reliable information in the past that law enforcement officers had verified," the CI's information was "entitled to far more credence than an unknown, anonymous tipster." United States v. Bynum, 293 F.3d 192, 197 (4th Cir. 2002) (citations omitted). Indeed, Clyburn itself suggests that controlled purchases may be necessary to help establish probable cause for a search warrant only where the informant's reliability may reasonably be questioned. See Clyburn, 24 F.3d at 618 (citing United States v. Allen, 960 F.2d 1055, 1057 (D.C. Cir. 1992); United States v. Martin, 920 F.2d 393, 398 (6th Cir. 1990)); see also United States v. Atwater, 32 F.3d 563, 1994 WL 411008, at *2 (4th Cir. 1994) (unpublished table decision) (suggesting that police corroboration of details provided in a tip from an informant of unknown reliability or an informant's controlled buy may establish probable cause). The court also considers "an officer's practical experience and the inferences the officer may draw from that experience . . . ." United States v. Humphries, 372 F.3d 653 (4th Cir.

7

2004) (citing Ornelas v. United States, 517 U.S. 690, 700 (1996)).  If the informant is known to be reliable, the additional corroboration of an controlled buy may be unnecessary.

Detective Faulcon testified that the CI was one of the better and more reliable informants he had dealt with, and had never provided false information in the past.  Because the CI was already known to be extremely reliable, the controlled buy would have only bolstered the CI's original information that defendant was selling cocaine, regardless of the particular procedures used.  Furthermore, Detective Faulcon's own observations confirmed many of the details given by the CI, including defendant's residence and the vehicle he drove, further corroborating the CI's information.  See United States v. Lalor, 996 F.2d 1578, 1581 (4th Cir. 1993) ("Corroboration of apparently innocent details of an informant's report tends to indicate that other aspects of the reports are also correct.") (citations omitted); see also id. ("Confirmation of [defendant's] address, vehicle and alias gives credence to the allegations of criminal activity."); United States v. Woods, 201 F.3d 439, 1999 WL 1080111, at *1 (4th Cir. 1999) (unpublished table decision) (upholding probable cause determination on similar information from a reliable informant).  Those observations also suggested to Detective Faulcon that a drug transaction had in fact taken place.

Defendant suggests the CI could have concealed drugs from Detective Faulcon during his "routine" search of his car and person.  Alternatively, because the CI was unsupervised during part of the controlled buy, he could have recovered them from a location where he had previously hidden them.  In other words, defendant alleges that the CI could have set up a "fake" controlled buy.  Even factoring these speculative possibilities into the analysis, the court concludes that the CI's consistent reliability, Detective Faulcon's observations and experiences, and the corroboration of sufficient

details of the CI's information would cause a prudent man to believe that defendant had sold the CI drugs and was about to do so again. Therefore, probable cause existed for the warrantless arrest.

B.     The Nexus Between The Alleged Criminal Activity and Defendant's Residence

Defendant also objects to the magistrate judge's finding that there was a sufficient nexus between his residence and the alleged criminal activity to establish probable cause to search the residence. For the same reasons he contests the controlled buy, defendant argues that there was insufficient information linking the alleged drug activity with his residence. He contends that Detective Faulcon "had no information, other than the CI's statement, that the suspect lived at that residence and/or was a drug dealer." (Def. Obj. 7.) He also objects to the magistrate judge's further analysis that, assuming probable cause did not support the warrant, the good faith exception to the warrant requirement would operate to bar application of the exclusionary rule. Because the court's own analysis confirms that probable cause supported the warrant, it need not address the second facet of defendant's objection.

As with a warrantless arrest, this court must look to the totality of the circumstances in determining whether probable cause supports the issuance of a search warrant. Gates, 462 U.S. at 238. Probable cause for a search warrant "exists when 'there are reasonably trustworthy facts which, given the totality of the circumstances, are sufficient to lead a prudent person to believe that the items sought constitute fruits, instrumentalities, or evidence of crime and will be present at the time and place of the search.'" Doe v. Broderick, 225 F.3d 440, 451 (4th Cir. 2000) (quoting United States v. Suarez, 906 F.2d 977, 984 (4th Cir. 1990). The "crucial element" of this determination is "whether it is reasonable to believe that the items to be seized will be found in the place to be searched." Lalor, 996 F.2d at 1582 (citation omitted).

In his Probable Cause Affidavit, Detective Faulcon gave his qualifications; stated his familiarity with all aspects of drug manufacture, sale, and distribution; described the controlled sale of cocaine utilizing the CI; vouched for the CI's past reliability and knowledge of the drug trade; and described his own observation of defendant leaving the location to be searched, driving to the meeting location on Saddle Street Drive, and then returning directly to the same location. (Def.'s Mot. to Suppress, Ex. B.) Based on his observations and experience, Detective Faulcon believed that the fact that defendant went directly to and from his residence during the controlled buy indicated that drugs were present in the residence.

The court finds that in the circumstances presented here, it was reasonable to believe that items related to illegal drug activity would be found at defendant's residence. First, the court reiterates its earlier conclusion that probable cause existed to believe that defendant had illegally sold cocaine to the CI and that another sale would occur the next day. The CI's past reliability certainly gives rise to "reasonably trustworthy facts" that defendant was selling drugs. Second, as the Fourth Circuit has noted, "the nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence." United States v. Anderson, 851 F.2d 727, 729 (4th Cir. 1988) (citations omitted). It is reasonable to infer that an individual involved in the sale of illegal drugs would keep his drug supply in his residence, especially where Detective Faulcon witnessed defendant exit that residence, proceed directly to the controlled sale of cocaine, and return to the residence.

10

## CONCLUSION

Upon *de novo* review of those portions of the M&R to which specific objections have been filed, and for the reasons thoroughly explained in this order, the court OVERRULES defendant's objections to the M&R, adopts the findings of the magistrate judge as its own (DE # 34), and DENIES defendant's motion to suppress (DE # 23).

SO ORDERED, this the 25th day of November, 2009.

_____
LOUISE W. FLANAGAN
Chief United States District Judge